Mary HUNDLEY, Appellant,

v.

Keith A. WENZEL, Director of Insurance, and Conseco Medical Insurance Company, Respondents.

No. WD 59031.

Missouri Court of Appeals, Western District.

Aug. 21, 2001.

As Modified Oct. 30, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 30, 2001.

Sherry L. Doctorian, Jefferson City, for appellant.

Stephen R. Gleason, Jefferson City, Kathryn M. Koch, St. Louis, for respondent.

Before ELLIS, P.J., LOWENSTEIN and BRECKENRIDGE, JJ.

BRECKENRIDGE, Judge.

Mary Hundley appeals the judgment of the Circuit Court of Cole County affirming the decision of the Missouri Director of Insurance denying her grievance against Conseco Medical Insurance Company. Her grievance challenged Conseco's declaration that her chiropractic treatment was not medically necessary and, thus, not covered by her health insurance policy, and

its refusal of payment. On appeal, Ms. Hundley first argues that the Director of Insurance erred in denying her grievance and declaring that her treatment was not medically necessary based upon the determination of the independent review organization. She claims that the decision was unlawful, unreasonable, arbitrary, capricious, an abuse of discretion and in excess of the Director's authority and jurisdiction because the Director (1) based his decision solely on the independent review organization's conclusions, which were unsupported by competent and substantial evidence and contrary to the overwhelming weight of the evidence in Ms. Hundley's medical records, and (2) based his decision on the conclusions of an orthopedic surgeon rather than on findings of a neurosurgeon or chiropractor. Second, she argues that the decision of the director was unconstitutional, unlawful, unreasonable, arbitrary, capricious, an abuse of discretion and in excess of the Director's authority and jurisdiction because Section 376.1387, RSMo 2000,[1] is unconstitutional on its face and as applied, depriving her of a private contractual right to payment of her medical expenses without due process of law. Because this court finds that the findings of the Director were arbitrary, capricious and unreasonable, the decision of the Director is reversed and the case is returned to the circuit court with directions that it remand the claim to the Director of Insurance for further review of Ms. Hundley's claim.

### Factual and Procedural Background

Ms. Hundley has a health insurance policy issued by National Casualty Company. Conseco Medical Insurance Company administers and reinsures Ms. Hundley's policy with National. Ms. Hundley's policy covers only those services that are medi-cally necessary. Beginning in October 1996, Ms. Hundley received treatment three times a week from Dr. Melissa Smith, a chiropractor, for tightness in her neck and shoulders. Dr. Smith ordered an x-ray of Ms. Hundley's lumbar spine, which was performed on December 11, 1996. The radiological report indicated that Ms. Hundley's "pelvis and femur are slightly low on the left," "[t]here is a right tower beginning at L4[,]" and "[t]here is a facet hypertrophy at L5." Further, it noted that "[t]he lateral view demonstrates a posterior shift of weight bearing."

In January 1997, Ms. Hundley's treatments from Dr. Smith were reduced to two times a week. In April 1997, Ms. Hundley sought treatment with a neurosurgeon, Dr. Faisal J. Albanna. Dr. Albanna determined that Ms. Hundley had cervical spondylosis with resulting symptomology of neck stiffness and upper extremity pain. Dr. Albanna prescribed for Ms. Hundley to continue to receive chiropractic treatment from Dr. Smith to consist of massage, ultrasound, cervical traction and fine manipulation without any gross adjustment, for a period of three to four weeks. Ms. Hundley returned to Dr. Albanna on a monthly basis from April 1997 to approximately October 1998. Dr. Albanna found favorable progress with Dr. Smith and continued to prescribe chiropractic treatment from Dr. Smith for Ms. Hundley.

The claims at issue are for chiropractic treatments Ms. Hundley received between March 1, 1998, and December 28, 1998. In March, April, and May of 1998, Dr. Smith treated Ms. Hundley three times a week. In June 1998, Dr. Smith treated Ms. Hundley 12 times; in July 1998, 8 times; in August 1998, 6 times; in September 1998, 5 times; in October 1998, 12 times; in November 1998, 11 times; and in De-

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

cember 1998, 11 times. Ms. Hundley submitted claims to Conseco for payment for these chiropractic treatments.

In the fall of 1998, Conseco performed a medical review of Ms. Hundley's claims for treatment received after March 1, 1998. The reviewer determined that Ms. Hundley's chiropractic treatment from March 1, 1998, to May 14, 1998, was maintenance care and was not medically necessary. Because the first reviewer was ineligible to review Ms. Hundley's claims, based upon the requirements of § 376.423, Conseco sought a second opinion from another independent licensed chiropractor, who also determined that Ms. Hundley's chiropractic treatment was not reasonable or necessary. After Dr. Albanna filed a letter of appeal, the second reviewer conducted a re-review, and again determined the treatment was not medically necessary. Conseco then obtained a third opinion about Ms. Hundley's chiropractic treatment. This third reviewer also found the treatment was not medically necessary. Conseco denied payment for Ms. Hundley's chiropractic treatments from March 1, 1998, to December 28, 1998.

Ms. Hundley appealed Conseco's determination to the Director of Insurance pursuant to § 376.1387. Under this statute, the Director referred Ms. Hundley's claim to an independent review organization, the Missouri Patient Care Review Foundation. An orthopedic surgeon selected by the organization reviewed Ms. Hundley's records as provided for in § 376.1387.1, and determined that Ms. Hundley's chiropractic treatment was not medically necessary. The Director of Insurance then notified Ms. Hundley that the independent review organization's determination would be the final agency decision.

Ms. Hundley filed a petition for judicial review in the Circuit Court of Cole County, in which she alleged that the Director's determination was unlawful and in excess of his statutory authority because the Director used an orthopedic surgeon to review Conseco's determination, and § 376.423.1 required the Director to use a licensed, practicing chiropractor as the reviewer. Ms. Hundley also alleged that the Director's determination was arbitrary and capricious because the medical reviewer failed to mention Ms. Hundley's treatment for torticollis and the medical records from Dr. Smith and Dr. Albanna clearly showed that Ms. Hundley improved with treatment. Pursuant to § 376.1387.1(2) and (4), the trial court reviewed the record before the Director, and determined that the Director's actions were "constitutional, lawful, reasonable, not arbitrary, not capricious, did not involve an abuse of discretion, and were within the statutory authority and jurisdiction of the Director." Ms. Hundley filed this appeal.

## Standard of Review

Prior to addressing the merits of Ms. Hundley's appeal, this court must consider the proper standard of review. The parties disagree as to the applicable standard under § 376.1387 because of its particular statutory scheme. This inquiry is limited, however, to a discussion of the appropriate scope of review of questions of fact, for it is well established that review of agency decisions of questions of law is de novo. See Davis v. Research Med. Ctr., 903 S.W.2d 557, 560 (Mo.App.1995).

■ The standard of review for decisions of the Director of Insurance is determined by statute. Section 376.1387 specifically provides for judicial review of decisions of the Director. Where a specific statute exists concerning judicial review of administrative procedures, it is to be followed exclusive of the general provisions for judicial review of administrative

decisions found in Chapter 536. *See e.g., State ex rel. Rogers v. Bd. of Police Comm'rs,* 995 S.W.2d 1, 6 (Mo.App.1999) (discussing police board procedures under Chapter 84). Chapter 536 is utilized, if necessary, "to fill in gaps in administrative procedures." *State ex rel. Noranda Aluminum, Inc. v. Pub. Serv. Comm'n,* 24 S.W.3d 243, 245 (Mo.App.2000).

██ Ms. Hundley claims that the standard of review this court should follow is that of a contested case, rather than a noncontested case. Section 376.1387.1 specifically provides, however, that the resolution of a grievance filed with the Director of Insurance "shall not be considered a contested case within the meaning of § 536.010." In a noncontested case, this court reviews the judgment of the trial court and not the agency, and thus the standard of review is the same as in any other court-tried case. In those cases, the trial court's judgment will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or it erroneously declares or applies the law. *State ex rel. Valentine v. Bd. of Police Comm'rs,* 813 S.W.2d 955, 957 (Mo. App.1991).

Ms. Hundley claims, however, that the standard for noncontested cases does not apply in this case because in the usual noncontested case, the trial court, pursuant to § 536.150, conducts a trial *de novo* and hears evidence, makes a record, and determines the facts. *See id.* Here, however, § 376.1387.1(2) provides that judicial review of the Director's decision is limited to the record before the Director. Thus, Ms. Hundley claims, this court should review the Director's decision, and not the trial court's judgment, to see if it is supported by competent and substantial evidence and is not against the weight of the evidence, which is the two-step analysis under *Davis,* 903 S.W.2d 557.

The Director of Insurance argues that this court should review the decision of the trial court, and not the Director of Insurance. Respondent Conseco, however, agrees with Ms. Hundley that this court should review the Director's decision, and not the trial court's judgment, and that this court should follow the two-step *Davis* analysis. Conseco cites *State ex rel. Fortney v. Joiner,* 797 S.W.2d 848, 851–52 (Mo. App.1990) to support its contention. In *Fortney,* this court discussed the difference between the appellate court's review of a contested and a noncontested case. In *Fortney,* the trial court treated a noncontested case like it was a contested case, and did not make findings on disputed facts. This court held that the trial court's misconception about the nature of its review of the agency's decision was not relevant to the appellate court's review. *Id.* at 852. Since the trial court considered only written documents and not live witnesses, the appellate court did not need to give deference to the trial court's judgment, so it could review the factual disputes *de novo. Id.*

Contrary to the arguments of the parties, this court's review is not dependent on whether the agency proceedings were contested or noncontested since there is a statute that articulates the scope of our review. As stated above, § 376.1387 provides that "[t]he grievance and resolution of such grievance shall not be considered a contested case within the meaning of section 536.010 . . . ." Section 536.010(2) defines "contested case" as "a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing[.]" Under § 376.1387, there is no hearing at the agency level, so grievances before the Director of Insurance would normally be noncontested cases. Nevertheless, § 376.1387.1(2) specifically states

that "[j]udicial review is limited to the record before the director[.]" According to § 376.1387.1(4), "[t]he scope of judicial review extends only to a determination of whether the action of the director is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion or is in excess of the statutory authority or jurisdiction of the director." Although generally in noncontested cases the appellate court would review the judgment of the circuit court,[2] here our review is determined by statute.

The statutory scheme for judicial review in § 376.1387 raises concerns, however. Under the provisions of § 376.1387 the default provisions of § 536.150, which provide *de novo* review of noncontested cases in the circuit court, do not apply to judicial review of decisions of the director of insurance. Section 376.1387 instead provides that the director's decision is to be made on the basis of the written record before the director, and that judicial review by the circuit court is limited to the record that was before the director. This court

questions whether the statutory scheme for judicial review of the director's decision deprives the enrollee, here Ms. Hundley, from the right to meaningful judicial review in violation of Article V, § 18, of the Missouri Constitution.[3]

Another area of concern regarding the statutory independent review process is that there are no criteria or guidelines in the statute or regulations that govern what written records are to be considered by the independent review organization. See § 376.1387. It is not clear whether the Director is directing the independent review organization to merely review the medical treatment records and render its own opinion, or whether the Director is treating the review as a forum for the parties to argue their cases to the reviewer. At the very least, it appears patently unfair to allow one side of a dispute to create the record upon which the dispute is resolved, without restriction, and to not allow the other side access to the record or an equal opportunity to present its side to the independent review organization.[4]

**2.** In *Fortney*, this court explained that the reason this court reviews the judgment of the circuit court and not the agency decision in a noncontested case is that "there is no record from the administrative body." 797 S.W.2d at 852. Here, however, the statute specifically indicates that the record to be reviewed is that which was before the Director.

**3.** Article V, § 18 states:

All final decisions, findings, rules and orders on any administrative officer or body existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights, shall be subject to direct review by the courts as provided by law; and such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record. Unless otherwise provided by law, administrative decisions, findings, rules and orders subject to review under this section or which are

otherwise subject to direct judicial review, shall be reviewed in such manner and by such court as the supreme court by rule shall direct and the court so designated shall, in addition to its other jurisdiction, have jurisdiction to hear and determine any such review proceeding.

**4.** In this case, the contents of the record submitted to the independent review organization raise questions concerning the fairness and appropriateness of the information before the reviewer and, therefore, the process. When Conseco was requested by the office of the Director to submit the "medical records or information concerning this dispute[.]" Conseco submitted, in addition to Ms. Hundley's medical records, five reports from internal reviews performed by Conseco. One of these reports was that of the first reviewer, which, as noted in the Director's file, was performed by a reviewer who was not authorized under § 376.423 to conduct such a review. In addition, the medical records submitted by Conseco were disorganized and

Additionally, Ms. Hundley asserts that the statutory scheme deprives her of her due process rights in violation of the Fourteenth Amendment to the United States Constitution and Article I, § 10, of the Missouri Constitution because it does not afford her a hearing before either the agency or the circuit court.

This court need not address these constitutional issues, because relief may be accorded in this case under the statute as written. This court is "constrained by the rule that courts will avoid deciding constitutional questions if the case can be fully determined without reaching constitutional issues." *State ex rel. Mo. Cable Telecomms. Ass'n v. Mo. Pub. Serv. Comm'n,* 929 S.W.2d 768, 771 (Mo.App.1996).

■ Furthermore, Ms. Hundley did not properly preserve for judicial review the challenge to the constitutionality of the statutory scheme. "To properly raise a constitutional issue, a party must: (1) raise it at the first available opportunity; (2) designate specifically the constitutional provision claimed to have been violated; (3) state the facts showing the violation; and (4) preserve the constitutional question throughout for appellate review." *Laubinger v. Laubinger,* 5 S.W.3d 166, 173

(Mo.App.1999). The purpose of this rule is "to prevent surprise to the opposing party, and to permit the trial court an opportunity to fairly identify and rule on the issue." *State ex rel. Nixon v. McClure,* 969 S.W.2d 801, 803 (Mo.App.1998). Ms. Hundley did not do so. Since the decision of the Director is reversed and the matter remanded, however, Ms. Hundley will have the opportunity to challenge the constitutionality of the statute in the circuit court.[5]

■ Thus, because this case can be decided under the statute as written, this court will review the record before the Director and determine whether the Director's decision was unconstitutional, unlawful, unreasonable, arbitrary, capricious, involves an abuse of discretion, or is in excess of its statutory authority or jurisdiction. In doing so, this court must also look to the findings of the independent review organization. Under § 376.1387 the decision of the independent review organization "shall be considered a final agency decision within the director's discretion[ .]" Here, the decision of the independent review organization was adopted by the Director and, thus, became his decision.

included confusing duplications. For example, the Physical Residual Functional Capacity Assessment Form, completed by Ms. Hundley's physicians at the request of a Social Security Administration administrative law judge and included as part of the medical records received from Dr. Smith, was included in whole or in part five times. And the April 15, 1997 patient evaluation by Dr. Albanna is included at least seven times. While this may not have been intentional, the sheer volume of the documents submitted could have made the review more difficult than necessary, and contributed to the fact that the reviewer overlooked some of the medical diagnoses that were actually contained. In contrast, Ms. Hundley was merely advised by the Director that they would obtain all medical records on file with the

insurer before proceeding with the independent review, and that she should forward any additional medical records or information as soon as possible. It does not appear that she was permitted to view the records submitted by Conseco or told that the "additional information" could include materials in support of her position.

5. This court further notes that had the question been properly preserved and had relief not otherwise been available, the challenge to the constitutionality of the statutory scheme would divest this court of jurisdiction and transfer to the Supreme Court would be required. MO. CONST. ART. V, § 3; *Jarvis v. Dir. of Revenue,* 804 S.W.2d 22, 23 (Mo. banc 1991).

### Director's Decision was Arbitrary, Capricious and an Abuse of Discretion

Turning to the merits of Ms. Hundley's appeal, she argues that the Director erred in denying her grievance and declaring her treatment not medically necessary based upon the determination of the independent review organization. She claims that the conclusions of the independent review organization were not supported by competent and substantial evidence and were contrary to the overwhelming weight of the evidence in her medical records. Thus, she argues that the decision of Director was unlawful, unreasonable, arbitrary, capricious, an abuse of discretion and in excess of his authority and jurisdiction.

■ "[A]n administrative agency acts unreasonably and arbitrarily if its findings are not based upon substantial evidence." *Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892 (Mo.App.1995). " 'Substantial evidence' is competent evidence which, if true, has a probative force on the issues." *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n*, 976 S.W.2d 470, 476 (Mo.App.1998). Likewise, the agency's failure to consider important aspects or factors of the issue can support a finding that the decision was arbitrary and capricious. *Barry*, 891 S.W.2d at 892.

At issue in the grievance procedure was whether Ms. Hundley's chiropractic treatments were medically necessary. Ms. Hundley's policy provides a definition of "medically necessary." It reads:

*MEDICALLY NECESSARY* means that a service or supply is necessary and appropriate for the diagnosis or treatment of an *illness* or *injury* based on generally accepted current medical practice. A service or supply will not be considered *medically necessary* if any of the following apply:

1. It is provided only as a convenience to the *covered person* or provider.

2. It is not appropriate treatment for the *covered person's* diagnosis or symptoms.

3. It exceeds (in scope, duration or intensity) the level of care that is needed to provide safe, adequate and appropriate diagnosis or treatment.

4. It is part of an *experimental treatment.*

The fact that any particular *doctor* may prescribe, order, recommend or approve a service or supply does not, of itself, make the service or supply *medically necessary.*

■ After review of Ms. Hundley's medical records, the independent review organization found the following:

This massive chart contains no objective evidence of neuromuscular or orthopedic disease. The patient had no recorded or experienced radicular symptoms. Multiple entries in the neurosurgical chart note calls from the patient requesting continuing chiropractic treatments. The neurosurgical exam was negative except for cervical spondylosis. Again, no objective physical findings are noted.

There was no medical necessity for chiropractic treatment from 03/01/98 to the present. The treatment given violated # 1, # 2, and # 3 of the 4 criteria used to determine medical necessity.

The findings of the independent review organization were adopted by the Director and became the Director's findings. Those findings, however, are not supported by the record.

### 1. Evidence of Neuromuscular or Orthopedic Disease Contained in the Record

The first finding of the Director is that "this massive chart contains no objective

evidence of neuromuscular or orthopedic disease." BLAKISTON'S GOULD MEDICAL DICTIONARY 931 (4th ed.1979) defines "objective" as "[p]ertaining to those relations and conditions of the body perceived by another, as objective signs of disease." "Neuromuscular" is defined as "[p]ertaining to both nerves and muscles." *Id.* at 908. "Orthopedic" is defined as "[p]ertaining to orthopedics, as orthopetic surgery[,]" which in turn is defined as "[t]hat branch of surgery concerned with corrective treatment of deformities, diseases, and ailments of the locomotor apparatus, especially those affecting limbs, bones, muscles, joints, and fasciae, whether by apparatus, manipulation, or open operation[.]" *Id.* at 958. Furthermore, "disease" is defined as "[t]he failure of the adaptive mechanisms of an organism to counteract adequately the stimuli or stresses to which it is subject, resulting in a disturbance in function or structure of any part, organ, or system of the body." *Id.* at 399. The Director's statement that there is "no" objective evidence of neuromuscular or orthopedic disease is contrary to the medical records.

### a. Neuromuscular or Orthopedic Disease

Ms. Hundley's medical records reflect numerous diagnoses of neuromuscular and orthopedic diseases, including cervical spondylosis, osteophyte formation, torticollis, spinal stenosis, and lateral recess stenosis. Specifically, Dr. Albanna diagnosed Ms. Hundley as having cervical spondylosis in April 1997 and again in October 1997. In March 1998, he indicated that her neck posture in which her neck tilts slightly to the right was a result of cervical spondylosis and a mild form of torticollis.

"Cervical spondylosis" is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1564 (28th ed.1994). Cervical spondylosis "results from chronic cervical disk degeneration, with herniation of disk material, secondary calcification, and associated ostephytic outgrowths." [6] CLINICAL NEUROLOGY 176 (Roger P. Simon et al. eds., 4th ed.1999). Cervical spondylosis is certainly a neurological disorder, THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 1516 (16th ed.1992), but it is not readily apparent whether it can be categorized in the field of neurology as a neuromuscular disease.[7] Regardless of whether this diagnosis can be specifically characterized as neuromuscular, evidence exists in the record of orthopedic disease.[8]

With regard to orthopedic disease, Dr. Albanna's diagnosed Ms. Hundley with torticollis in March 1998. "Torticollis" is defined as a "[d]eformity of the neck due to contraction of cervical muscles or fascia," [9] but most prominently involving the

---

6. "Osteophyte" is defined as "a bony growth." BLAKISTON'S GOULD MEDICAL DICTIONARY 965.

7. Evidently, cervical spondylosis has similar symptoms to the neuromuscular disorder amyotrophic lateral sclerosis. *See* AN INTRODUCTION TO DIAGNOSIS AND MANAGEMENT OF COMMON NEUROLOGIC DISORDERS 201 (Peritz Scheinberg ed., 3rd ed.1986) (cautioning against confusing the two since cervical spondylosis is surgically treatable where amyotrophic lateral sclerosis has no known therapy).

8. Some of the orthopedic diseases can also be characterized as neurological diseases. That fact will not be addressed in this section since they are not considered neuromuscular diseases.

9. "Fascia," used in the definition of torticollis, means "[t]he areolar tissue layers under the skin (superficial fascia). 2. The fibrous tissue between muscles and forming the sheaths of muscles, or investing other deep, definitive structures, as nerves and blood ves-

sternocleidomastoid muscle unilaterally, resulting in abnormal position and limitation of movements of the head. BLAKISTON'S GOULD MEDICAL DICTIONARY 1383. "Spasmodic torticollis . . . is characterized by a tendency for the neck to twist to one side." CLINICAL NEUROLOGY, 245.

Additionally, in October 1998, Dr. Albanna reported that Ms. Hundley's "MRI of the lumbosacral spine shows spinal stenosis of moderate degree and lateral recess stenosis at L4–L5 with moderate disc degeneration at L4–L5." "Spinal stenosis" is "[l]ocalized narrowing of the spinal canal from a structural abnormality of its bony components." HANDBOOK OF ORTHOPAEDIC SURGERY 372 (H. Robert Brashear, Jr. and R. Beverly Raney, Sr. eds., 10th ed.1986). "Stenosis," generally, is the "narrowing or stricture of a duct or canal." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1576. "Lateral recess" is defined as "[t]he lateral extension of the fourth ventricle in the angle between the cerebellum and the medulla oblongata." [10] BLAKISTON'S GOULD MEDICAL DICTIONARY 745. While "[t]he causes of spinal stenosis are many and varied[,][l]ocal bone deformities, congenital or acquired, may be responsible." HANDBOOK OF ORTHOPAEDIC SURGERY 372.

Ms. Hundley's medical records include the diagnoses of torticollis and spinal and lateral recess stenosis which are orthopedic diseases, relating to the "corrective treatment of deformities, diseases, and ailments of the locomotor apparatus, especially those affecting limbs, bones, muscles, joints, and fasciae, whether by apparatus, manipulation, or open operation[.]" BLAKISTON'S GOULD MEDICAL DICTIONARY 958.

**b. Objective Evidence and Findings**

The issue is whether there was objective evidence to support these diagnoses · of neuromuscular or orthopedic disease since, in his final sentence in the findings, the Director notes that the diagnoses lacked objective evidence or findings to support them. Contrary to the Director's findings, the medical records reflect that the conditions of Ms. Huddle's body resulting in each of these diagnoses were perceived by Dr. Albanna based upon objective findings from his evaluations and the tests, including the MRIs, that were performed at his request. Specifically, the facts in the record are that prior to seeing Dr. Albanna for the first time on April 15, 1997, a standard MR/CT imaging study was performed on Ms. Hundley's cervical spine.[11] The results of this exam revealed "midline central disc protrusion at C4–5" and "posterior disc bulging at C5–6." Following this examination, Ms. Hundley was seen by Dr. Albanna. In the patient evaluation, Dr. Albanna noted that Ms. Hundley had "decreased range of motion of her cervical spine." He also noted that "[h]er MRI of

---

sels (deep fascia)." BLAKISTON'S GOULD MEDICAL DICTIONARY 495.

**10.** The "cerebellum" is "[t]he inferior part of the brain lying below the cerebrum [the largest portion of the brain, occupying the whole upper part of the cranium, and consisting of the right and left hemispheres . . . ] and above the pons and medulla oblongata, consisting of two lateral lobes and a middle lobe." *Id.* at 249, 251. The "medulla oblongata," used both in the definition of "lateral recess" and "cerebellum[,]" is "[t]he most caudal [i.e ., directed toward the tail] part of the brain extending from the pons to the spinal cord."

*Id.* at 815, 237. The "pons" is [t]he portion of the brainstem between the midbrain and the medulla oblongata." *Id.* at 1079.

**11.** The record contains medical records concerning Ms. Hundley's diagnoses and treatment from Dr. Albanna and Dr. Melissa Smith, Ms. Hundley's chiropractor. The reports from Dr. Albanna, however, provide sufficient evidence to refute the findings of the independent review organization, and thus this court's review will be limited to the diagnoses and findings of Dr. Albanna.

the cervical spine suggests cervical spondylosis and osteophyte formation at C4–C5 and C5–C6 with compromise of the spinal canal[,]" and that she "ha[d] a picture of cervical spondylosis with resulting symptomatology of neck stiffness and upper extremity pain." In October 1997, Dr. Albanna also reported that Ms. Hundley "continue[d] to have some residual decreased range of motion of her cervical spine[,]" and that she did, "indeed, have cervical spondylosis on MRI." On March 3, 1998, Dr. Albanna noted that Ms. Hundley "ha[d] a neck posture whereby she tilts slightly to the right." "This," he noted "[was] a result of cervical spondylosis and a mild form of torticollis."

In August 1998, Dr. Albanna suspected that Ms. Hundley had "other causations affecting the spinal cord, the cauda equina, such as a tumor or a huge disc herniation causing cauda equina syndrome[,]" so he ordered another MRI and x-rays. The report of the MRI stated that "[t]here is a very tiny posterior central disk protrusion at L4–5 with minimal anterior indentation of the thecal sac, of questionable significance. There is mild degenerative change in the L3–4 and L5–S1 disk." In October 1998, Dr. Albanna reported that Ms. Hundley's "MRI of the lumbosacral spine shows spinal stenosis of moderate degree and lateral recess stenosis at L4–L5 with moderate disc degeneration at L4–L5." In the April 1997, October 1997, and October 1998 reports, Dr. Albanna noted that surgical intervention might be necessary.

In summary, Dr. Albanna diagnosed cervical spondylosis in April 1997 based upon an MRI. This diagnosis was reiterated in October 1997 and December 1997 based, again, upon the MRI. In March 1993, Dr. Albanna added a diagnosis of a "mild form of torticollis" based upon his observations of her neck posture being titled slightly to the right. Finally, in October 1998, after

another MRI, Dr. Albanna diagnosed "spinal stenosis of moderate degree and lateral recess stenosis at L4–L5 with moderate disc degeneration at L4–L5."

Each of these diagnoses was based either on Dr. Albanna's observation of physical conditions or the MRI reports. Thus, the evidence of disease meets the definition of "objective." The evidence in the record does not support the Director's finding that Mr. Hundley's "massive chart contains no objective evidence of neuromuscular or orthopedic disease." Such evidence does exist.

## 2. Record Reflects Recorded and Experienced Radicular Symptoms

The next finding of the Director states that "the patient had no recorded or experienced radicular symptoms." "Radicular" is defined as "[r]elating to the root of an anatomic structure (e.g., of a tooth or a nerve)." Attorney's Illustrated Medical Dictionary, R2 (1997).

In his April 15, 1997 evaluation, Dr. Albanna noted that Ms. Hundley "presents with neck stiffness, bilateral shoulder stiffness, . . . weakness in her arm . . . and sharp pain radiating from the shoulder and behind the ears. She indicates that she drops things easily, particularly with her left hand." These symptoms, along with an MRI, led to the diagnosis of cervical spondylosis. Clinical findings associated with cervical spondylosis include, "radicular pain and other sensory disturbances . . . in the arms, and there may be weakness of the arms or legs."

Furthermore, in August 1998, Ms. Hundley complained of "progressive numbness involving her right lower extremity, imbalance, and deviation of her left lower extremity." While Dr. Albanna noted that she "denie[d] any particular pain symptoms except for occasional low

back pain and pain occasionally in her legs[,]" he suspected that she may have "other causations affecting the spinal cord"; thus, he ordered another MRI. On October 27, 1998, Ms. Hundley returned to see Dr. Albanna. His evaluation stated that "[t]he patient returns to the office for evaluation of her low back and right lower extremity sciatic-type pain." He also noted that her MRI showed "spinal stenosis of moderate degree and lateral recess stenosis ... with moderate disc degeneration." THE MERCK MANUAL 1363, defines "spinal stenosis" as "a less common form of sciatica [i.e., pain radiating along the course of the sciatic nerve, most commonly caused by peripheral nerve root compression from intervertebral disk protrusion or intraspinal tumor,] that results from lumbar spinal canal narrowing, causing pressure on the roots (or rarely the cord) prior to their exit from the formina, and mimics vascular disease by simulating intermittent claudification." Spinal stenosis "involves the sciatic nerve roots and is manifested by pain in the buttock, thighs, or calves on walking, running or climbing stairs." *Id.*

The symptoms reported by Ms. Hundley and the diagnoses by Dr. Albanna concerning both cervical spondylosis and spinal stenosis provide evidence in the record of and are consistent with recorded and experienced radicular symptoms. Thus, the finding of the Director in this regard is not supported by substantial evidence.

### 3. Neurosurgical Exam Shows Additional Diagnoses

The Director also found that the "neurosurgical exam was negative except for cervical spondylosis." This finding, too, is not supported by the record. As stated above, in addition to cervical spondylosis, Dr. Al-

banna, a neurosurgeon, diagnosed torticollis, spinal stenosis, and lateral recess stenosis. Torticollis and spinal stenosis are diseases related to the field of neurology and surgical intervention can be an option. *See* CLINICAL NEUROLOGY 245 (torticollis), 223 (spinal stenosis) and AN INTRODUCTION TO DIAGNOSIS AND MANAGEMENT OF COMMON NEUROLOGIC DISORDERS 82 (Peritz Scheinberg ed., 3rd ed.1986) (surgical treatment of torticollis). In his October 27, 1998 evaluation, Dr. Albanna noted with respect to the diagnosis of spinal stenosis and lateral recess stenosis that if Ms. Hundley failed to respond to the treatment measures recommended by him, he may recommend "surgery that may entail lumbar decompression and fusion with instrumentation ." [12] Thus, the record provides evidence from the neurosurgical exam of diseases or diagnoses other than cervical spondylosis.

Conseco does not dispute that the record contains these findings of Dr. Albanna. In responding to Ms. Hundley's recitation of the definitions of the various diagnoses that were contained in her brief, which are very similar to this court's discussion, Conseco states, instead, that "[n]one of these definitions offer the layperson an explanation of what level of care, if any, is required by these conditions, whether these conditions are resolvable, and if so, whether these conditions will be resolved best through exercise, pharmaceutics, limited or massive chiropractic treatment, surgery, or the passage of time." Yet the decision of the Director did not rest on this basis.

Moreover, Conseco argues that "[i]t is understandable that the [independent review organization]'s orthopedic surgeon

---

12. Dr. Albanna had also noted the possibility of surgical intervention in April 1997 and October 1997. At this time, his diagnosis of Ms. Hundley concerned only cervical spondylosis.

would discount the credibility of Dr. Albanna's and Dr. Smith's conclusions that their treatment was 'medically necessary' as self-serving." This assessment of the independent review organization's analysis is not supported by the findings or conclusions. The findings state that there was no objective evidence of neuromuscular or orthopedic disease, no recorded or experienced radicular symptoms, and no neurosurgical evidence except for cervical spondylosis, which, as demonstrated above, is unsupported by the record. This does not suggest that conclusions of Dr. Albanna were discounted, rather it implies that the diagnoses were not made. Conseco's theories concerning the conclusions of the Director, which have no evidentiary basis, are insufficient to avoid a finding of arbitrary, capricious and abuse of discretion. Furthermore, the decision of the Director, with respect to its stated findings and conclusions, fails to provide an explanation concerning how those findings relate to the definition of medically necessary.

The decision of the Director that no objective evidence of neuromuscular or orthopedic disease, no recorded or experienced radicular symptoms, and no neurosurgical evidence except for cervical spondylosis is unsupported by the record. Thus, the ultimate conclusion, that the treatment was not medically necessary, is based upon erroneous findings, which were material to the decision. As such, the ultimate conclusion is arbitrary and capricious. *Barry Serv. Agency Co.*, 891 S.W.2d at 892.

### 4. Requesting Continued Chiropractic Treatment

 The next finding of the Director, although not disputed by Ms. Hundley, is inadequate to lead to the conclusion that the treatments were merely for convenience in the definition of medical necessity. The Director found that "[m]ultiple entries in the neurosurgical chart note calls from the patient requesting continuing chiropractic treatments[.]" Ms. Hundley does not dispute the fact that the record contains these requests, but instead argues that nothing in the policy's definition of medical necessity indicates that requesting chiropractic treatment renders the treatment not medically necessary. Ms. Hundley's point is well taken. The findings of the Director provide no basis upon which to conclude that simply requesting treatment causes it to be outside the definition of medically necessary. The logical link between Ms. Hundley's requesting further treatment and it being provided only as a convenience to her is missing. If this assertion were true, then most, if not all, treatment would fall outside the definition of medically necessary.

### 5. Actions of the Director

 The Director does not address Ms. Hundley's challenge to the findings that no objective evidence of neuromuscular or orthopedic disease, recorded or experienced radicular symptoms, and neurosurgical evidence in addition to cervical spondylosis exists. Instead, he asserts that he referred the grievance procedure to the independent review organization, relied on and deferred to the independent review organization's medical expertise, and subsequently adopted its medical opinion. In essence, the Director argues that he followed the procedural requirements of § 376.1387, so his actions could not be unconstitutional, unlawful, unreasonable, arbitrary, capricious, an abuse of discretion, or in excess of his statutory authority or jurisdiction. The Director has cited nothing, however, to support that he is mandated to adopt the findings and conclusions of the independent review organization or that his actions are reviewable only on procedural grounds. Section 376.1387.1

provides that the resolution of a grievance by an independent review organization "shall be considered a final agency decision within the director's discretion...." Thus, the statute gives the Director discretion in deciding whether the independent review organization's decision becomes the final agency decision. The decision is the Director's and it is this decision and, in turn, any conclusions reached by the independent review organization that are adopted by the Director, that are reviewable to determine whether the decision "is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion or is in excess of the statutory authority or jurisdiction of the director." Section 376.1387.1(4).

### Review by Chiropractor or Neurosurgeon Not Required by Statute

Ms. Hundley next argues that the Director's decision was unreasonable, arbitrary, capricious and not supported by competent and substantial evidence because the decision was not based upon a review of the records by a chiropractor or neurosurgeon. Ms. Hundley claims that the review conducted by the independent review organization was contrary to the intent of Chapter 376, since it was conducted by an orthopedic surgeon reviewing the diagnoses and treatment of a neurosurgeon and chiropractor. In support of this assertion, she cites § 376.423, which requires that "any consultant retained by any insurance company, health services corporation and any self-insured group arrangement" to review the denial of services rendered by a chiropractor shall "[b]e licensed and practicing as a chiropractor in the state of Missouri." While she recognizes that this section refers only to insurance companies, health services organizations and self-insured groups, she claims that the legislative intent is "to make sure that there is a uniform standard for chiropractic review and that the consumer is protected from the unfair practice of having a difference medical specialist review the records of a chiropractor."

While part of statutory interpretation concerns ascertaining the legislative intent, this "court is without authority to read into a statute a legislative intent contrary to the intent made evident by the plain language" of the statute. *Mo. Nat'l Educ. Ass'n v. Mo. State Bd. of Educ.*, 34 S.W.3d 266, 279 (Mo.App.2000). Clearly, the language of § 376.423 reveals that it is applicable to insurance companies, health services organizations and self-insured groups. It does not, however, state that it also applies to the resolution of grievances referred by the director to an independent review organization under § 376.1387. Furthermore, § 376.1387.1 provides that "[t]he director shall establish the qualifications for such review organizations(s) [sic]...." This court is required to apply the statutes as written and cannot rewrite the statutes to include the intent offered by Ms. Hundley, especially where that intent is not clearly evident from a reading of either statute. *See Craven v. State ex rel. Premium Standard Farms, Inc.*, 19 S.W.3d 160, 165 (Mo.App.2000). This court finds that the Director is not required to have the grievance reviewed by a chiropractor or other doctor in a specific field of medicine or practice.

### Conclusion

As noted previously, this court finds that the decision of the Director, which adopted the findings and conclusions of the independent review organization, was arbitrary and capricious because the decision was not based upon substantial evidence. The decision of the Director with respect to the findings that the chiropractic treatment is not medically necessary is reversed and

the case is remanded to the circuit court with directions that it remand the claim to the Director of Insurance for further review of Ms. Hundley's claim by an independent reviewer who possesses an appropriate record for review.

All concur.