Linda **CHIPPERFIELD**, and Sierra Club, Petitioners–Appellants,

v.

**MISSOURI AIR CONSERVATION COMMISSION, Respondent–Respondent,**

and

**City Utilities of Springfield, Intervenor–Respondent.**

No. 27947.

Missouri Court of Appeals, Southern District, Division Two.

June 18, 2007.

Rehearing Denied July 10, 2007.

Application for Transfer Denied Aug. 21, 2007.

George E. Hays, San Francisco, CA, William J. Moore, III, Law Office of William J. Moore, III, P.A., Jacksonville, FL, James H. Arneson, Springfield, MO, for appellants.

Jeremiah W. (Jay) Nixon, Attorney General, Shelley A. Woods, Assistant Attorney General, Jefferson City, MO, for respondent Missouri Air Conservation Commission.

Gary Cunningham, Joseph L. Johnson, Lathrop & Gage, L.C., Springfield, Terry Satterlee, Thomas Grever, Shook, Hardy & Bacon, Kansas City, MO, for intervenor-respondent City Utilities of Springfield.

GARY W. LYNCH, Judge.

Linda Chipperfield and Sierra Club ("Appellants") appeal the judgment of the Circuit Court of Greene County, Missouri, affirming the decision and order of the Missouri Air Conservation Commission ("Commission") which upheld the Missouri Department of Natural Resources' ("MDNR") issuance to City Utilities of Springfield ("City Utilities") of a permit to construct a pulverized coal-fired boiler. We affirm.

### 1). *Procedural History*

City Utilities is a not-for-profit governmental unit of the City of Springfield, Missouri, which provides water, gas, electric, telecommunications, and transit services to its citizen rate-payers. In April of 2003, City Utilities applied to the MDNR for a permit to construct a new, pulverized coal-

fired boiler at its Southwest Power Station in Springfield ("Application").[1] City Utilities currently operates a coal-fired unit at the Southwest Power Station that produces around 178 megawatts of electricity. Studies conducted by City Utilities concluded that the proposed second unit ("Southwest 2"), which will be capable of generating 275 megawatts of electricity, is necessary to meet the increasing energy needs of the Springfield area.

From April 2003 through June 2004, MDNR reviewed and evaluated the application and prepared a draft permit ("Draft Permit"). MDNR issued the Draft Permit for public review on June 16, 2004, and invited public comments. Several agencies and organizations, including the United States Environmental Protection Agency ("EPA"), Sierra Club, and City Utilities, submitted detailed comments. MDNR issued the final permit ("Permit") authorizing construction of Southwest 2 with attached responses to the public comments on December 15, 2004.

On January 14, 2005, Sierra Club, a nonprofit environmental protection organization, together with its local member and Springfield-area resident Linda Chipperfield filed a Notice of Appeal with the Commission.[2] In addition to requesting an appeal, the Notice of Appeal contained forty-seven numbered paragraphs alleging reasons why the Permit was invalid, and further requested that the Commission grant a full evidentiary hearing and enter an order denying issuance of the Permit.[3] City Utilities subsequently intervened in the proceeding as an interested party.

The Commission appointed W.B. Tichenor as the Hearing Officer for the appeal in April, 2005.[4] Before holding an evidentiary hearing, Hearing Officer Tichenor heard oral arguments from all parties on MDNR's and City Utilities' motions to dismiss certain of Appellants' forty-seven allegations of claimed deficiencies in the permit or the permitting process. After considering the parties' arguments and authority, or lack of authority, Hearing Officer Tichenor dismissed twenty-nine of Appellants' forty-seven allegations, which he ruled were either moot or invalid as a matter of law for failure to state a claim and were "stricken" from the Notice of Appeal. Appellants voluntarily withdrew or abandoned an additional eleven claims; other claims were combined or "subsumed" together.

From October 11 through 13, 2005, Hearing Officer Tichenor presided over an evidentiary hearing, during which all par-

1. MDNR is the duly authorized state agency under Chapter 640, RSMo 2000, to administer programs relating to environmental control and the conservation and management of the natural resources of the State of Missouri. *See* §§ 640.010, 643.020 and 643.073, RSMo 2000.

2. The Commission is the administrative body charged with hearing appeals of MDNR's final permit decisions, pursuant to Chapter 643, RSMo 2000. *See* §§ 643.075(6) and 640.010.

3. Section 643.075.6, RSMo 2000 provides:

Any aggrieved person may appeal any permit decision made under this section, in-

cluding failure to render a decision within the time period established in this section. A notice of appeal shall be filed with the commission within thirty days of the director's action or within thirty days from the date by which the decision should have been rendered if the director has failed to act.

In the event of such an appeal, the burden of proof is upon MDNR. § 640.012, RSMo Cum. Supp.2004.

4. Pursuant to § 643.100.3(2), RSMo 2000, the hearing officer presides over an evidentiary hearing, hears all evidence, and rules on the admissibility of evidence, then makes recommended findings of fact and conclusions of law to the Commission.

ties had full opportunity to present evidence and cross-examine witnesses. On November 23, 2005, Hearing Officer Tichenor issued his recommendations to the Commission in the form of a proposed order affirming issuance of the Permit. The Commission convened on December 8, 2005, where it heard oral comments from counsel for all parties, as well as from Hearing Officer Tichenor. Thereafter, the Commission issued its Decision and Order, dated December 8, 2005, containing findings of fact and conclusions of law affirming the issuance of the Permit.

On January 6, 2006, Appellants filed a Petition for Judicial Review ("Petition for Review") of the Commission's Decision and Order in the Circuit Court of St. Louis County, Missouri.[5] The action was transferred to the Circuit Court of Greene County upon joint motion by the parties. After considering the record on appeal, briefs from all parties, and oral arguments by counsel, the circuit court, on July 7, 2006, affirmed the Commission's Decision and Order. This appeal followed.

### 2) *Standard of Review*

■■■ Section 536.140 defines the scope of appellate review.[6] The findings and conclusions of the Commission are reviewed, not the judgment of the circuit court. § 536.140; *Edwards v. Mo. State Bd. of Chiropractic Exam'rs*, 85 S.W.3d 10,

19 (Mo.App.2002). This court will affirm the Commission's decision unless it is unsupported by competent and substantial evidence upon the whole record; is arbitrary, capricious or unreasonable; or constitutes an abuse of discretion. § 536.140; *Edwards*, 85 S.W.3d at 19. The evidence and all reasonable inferences therefrom are considered in the light most favorable to the Commission's decision. *Id.* This court will not weigh the evidence or substitute its discretion on factual matters for that of the Commission. *Id.; Hernandez v. State Bd. of Registration for Healing Arts*, 936 S.W.2d 894, 900 (Mo.App.1997). Even if the evidence supports either of two findings, this court is bound by the Commission's factual determination. *Edwards*, 85 S.W.3d at 19. We defer to the expertise of the Commission in reaching decisions based on scientific and technical data. *Morton v. Mo. Air Conservation Comm'n*, 944 S.W.2d 231, 236 (Mo.App. 1997). We can, however, independently determine questions of law. *Edwards*, 85 S.W.3d at 19. Appellate review of the Commission's decision is also limited to preserved errors only as defined in the petition for review before the circuit court. *Id.* at 21; *Ruffin v. City of Clinton*, 849 S.W.2d 108, 114 (Mo.App.1993).

### 3) *Discussion*

Appellants' brief[7] contains sixteen

---

**5.** The Petition for Review was filed pursuant to §§ 643.130 and 536.100–.140, RSMo 2000.

**6.** All references to statutes are to RSMo 2000, unless otherwise indicated.

**7.** City Utilities urges us to dismiss the appeal because of "numerous glaring deficiencies" in Appellants' brief. These alleged deficiencies include: (1) Appellants' points-relied-on do not set forth the legal reasons for any claim of error and fail to provide why, in the context of the case, those legal reasons support the claims of reversible error; (2) *Appellants'* arguments lack sufficient supporting legal au-

thority to preserve the issues for review; (3) Appellants' brief fails to adequately cite to the record to support their factual assertions and improperly recites a one-sided incomplete recitation of facts; and (4) the argument section of Appellants' brief argues errors not properly raised and preserved in Appellants' points-relied-on. While some of these alleged deficiencies are applicable to some of the points-relied-on and arguments, they are not so pervasive as to warrant dismissal of the appeal. Particular deficiencies which impede or *hamper appellate review will be identified*, discussed, and considered as they arise and

points-relied-on lettered A through P.[8] For ease of analysis, these points are grouped into two broad subject areas and addressed in this opinion in the following order: (1) procedural issues—Points A through G, related to the dismissal of claims asserted in Appellants' Notice of Appeal to the Commission, and Point P, related to the Commission's designation in its Decision and Order of Kendall Hale and Kyra Moore as expert witnesses; and (2) emission limitation issues—Points I through K, related to the sulfur dioxide ($SO_2$) emission limitation in the Permit, Points L through N, related to the nitrogen oxides ($NO_X$) emission limitation in the Permit, Point O, related to the cooling tower emission limitation in the Permit, and Point H, related to the lack of any visible emission limitation in the Permit.

### a) Procedural Issues

### i) Appellants' Points A through G Relating to Dismissal of Certain Claims in Appellants' Notice of Appeal to Commission

#### (1) Point A [9]

Appellants' first point on appeal (Point A) actually contains three separate claims of error. Appellants contend that the Commission committed reversible legal error by approving and adopting the Hearing Officer's dismissal of Appellants' claims in their Notice of Appeal to the Commission without: (1) first reviewing the briefs related to the motions to dismiss and the Hearing Officer's ruling on those motions; (2) creating a transcript of the proceedings of the Commission on December 8, 2005; and (3) circulating the Hearing Officer's proposed order to the parties for review before the December 8, 2005 proceeding.[10]

---

8. We note that Appellants have identified sixteen points-relied-on, lettered A through P. However, Appellants have failed to restate each point-relied-on "at the beginning of the section of the argument discussing that point." Rule 84.04(e). Rather, Appellants have opted to divide their argument into fifteen sections, numbered 1 through 15 with a heading for each section denominated as a "Specific Legal [Error] Committed by the Commission." The section headings, while generally touching upon similar subject matters as raised in the points-relied-on, are worded very differently and raise errors, legal reasons, and factual assertions much different than the denominated points-relied-on. None of the section headings comply with the requirements of a valid point-relied-on. See Rule 84.04(d)(2). For the purposes of this appeal and opinion, we consider Appellants' denominated points-relied-on as their points-relied-on and the section headings as merely a part of the argument portion of their brief. While Appellants' failure to restate each point-relied-on at the beginning of the section

are pertinent to the discussion of each individual point-relied-on.

of their argument discussing that point is not fatal to their appeal in this instance, we certainly discourage this practice and continue to urge full compliance with Rule 84.04(e).

9. Appellants' Point A in its entirety is:

The Commission committed reversible legal error by approving and adopting the Hearing Officer's dismissal of [Appellants'] claims without reviewing the ruling on the motion to dismiss or the briefs regarding the same. For similar reasons, the Commission erred as a matter of law by failing to transcribe the hearing before the Commission regarding the approval of the challenged permit and by forcing the [Appellants] to comment to the Commission about the proposed order from the Hearing Officer without being able to review that order first.

10. This point is multifarious and arguably preserves nothing for appellate review. Law Offices of Gary Green, P.C. v. Morrissey, 210 S.W.3d 421, 424 (Mo.App.2006). However, we will separate Appellants' contentions, as best we can discern them, and respond to each one individually. Id.

**(a)** ***First Claim under Point A—Claim that Commission Failed to Review Briefs and Hearing Officer's Ruling on Motion to Dismiss***

■ Appellants' Petition for Review filed in the circuit court contended there was no evidence in the record that the Commission ever reviewed the Hearing Officer's ruling on the motions to dismiss. However, it contained no allegations concerning the failure of the Commission to review the briefs related to those motions. Appellants' allegations of error are preserved for our review only as far as they are defined in the Petition for Review. *See Edwards,* 85 S.W.3d at 21; *Ruffin,* 849 S.W.2d at 114. Therefore, we are precluded from considering any claim or argument as to the Commission's alleged failure to review the briefs, because that issue was not asserted in the Petition for Review.

■ As to the Hearing Officer's ruling on the motions to dismiss, Appellants allege in the argument portion of their brief for this point that the Commission's failure to review that ruling was a violation of § 643.100.3(3), which requires: "Any commission member approving in writing any final order or determination or other final action, who did not attend the hearing, shall do so only after reviewing all exhibits and reading the entire transcript." [11] However, Appellants' point-relied-on did not include any reference to this statute as the legal basis for any error nor did it explain why this legal reason in the context of this case supports the claimed error, so the claim was not preserved for appellate review. Rule

84.04(d)(2); [12] *Henson v. Henson,* 195 S.W.3d 479, 481 (Mo.App.2006); *Houston v. Weisman,* 197 S.W.3d 204, 205 (Mo.App. 2006). *Ex gratia,* we note that Appellants' argument fails because the Hearing Officer's ruling on the motions to dismiss was neither an exhibit nor part of the transcript. Lacking such status, the Commission was not required by § 643.100.3(3) to review it prior to approving the Decision and Order. This first claim of Point A is denied.

**(b)** ***Second Claim under Point A—Claim that Commission Failed to Create Transcript of December 8, 2005 Proceeding***

■ Appellants next claim that the Commission erred by failing to transcribe the proceedings held by the Commission on December 8, 2005. However, Appellants never raised this claim of error in their Petition for Review and therefore failed to preserve it for review by the circuit court or this court. *See Edwards,* 85 S.W.3d at 21; *Ruffin,* 849 S.W.2d at 114. This second claim of Point A is denied.

**(c)** ***Third Claim under Point A—Claim that Commission Failed to Circulate Hearing Officer's Proposed Order to Parties for Review***

■ Appellants assert in the argument portion of their brief under this point that the Commission's failure to allow the parties to review the Hearing Officer's proposed order before they made oral comments at the December 8, 2005 proceeding

---

**11.** Appellants also contend in their argument that the Commission's failure to review the Hearing Officer's ruling violated § 536.080. Because this legal basis was not raised in either the Petition for Review or the point-relied-on, it was not preserved for review. Missouri Court Rule 84.04(d)(2) (2005); *Ed-*

*wards,* 85 S.W.3d at 21; *Ruffin,* 849 S.W.2d at 114; *Henson,* 195 S.W.3d at 481; *Houston,* 197 S.W.3d at 205.

**12.** All references to rules are to Missouri Court Rules (2005).

violated their due process rights. Because the point-relied-on did not include this legal reason nor explain why this legal reason supports the claimed error, this claim was not preserved for appeal. Rule 84.04(d)(2); *Henson*, 195 S.W.3d at 481; *Houston*, 197 S.W.3d at 205. This third claim of Point A is denied.

Having denied all three of the claims made in Point A, it is denied.

### (2) *Point B—Claim that Neither Hearing Officer nor Commission Had Authority to Dismiss Claims*

■ Appellants' Point B contends the Commission erred by approving and adopting the Hearing Officer's ruling on the motions to dismiss "when neither the Hearing Officer nor the Commission had the statutory authority to dispense with any of [Appellants'] claims on a motion to dismiss." This claim of error was not raised in the Petition for Review and was therefore not preserved for appeal. *See Edwards*, 85 S.W.3d at 21; *Ruffin*, 849 S.W.2d at 114. Point B is dismissed.

### (3) *Points C Through G—Claims that Commission Erroneously Approved and Adopted Hearing Officer's Order Dismissing Specific Claims*

Points C through G relate to the Hearing Officer's dismissal of specific claims in Appellants' original Notice of Appeal filed with the Commission. Appellants allege that the Commission erred in approving and adopting the ruling of the Hearing Officer dismissing the following claims: (1) that MDNR failed to consider all available production processes or available methods, systems, and techniques in conducting its "BACT" determination (Point C); (2) that some conditions of the proposed permit were unenforceable (Point D); (3) that MDNR's "Additional Impacts Analysis" was inadequate (Points E and F);[13] and (4) that the Permit improperly exempts compliance with emission limits during periods of start up and shut down (Point G).

■ In their Petition for Review, Appellants framed these claims of error differently. They alleged that the Hearing Officer himself erred in dismissing these claims; they did not allege that the Commission erred in approving and adopting his decision. Whether the Hearing Officer erred in dismissing these claims is a distinctly separate issue from whether the Commission erred in approving and adopting his decision. The Hearing Officer is charged with holding an evidentiary hearing, hearing evidence, and ruling on the admissibility of evidence under § 643.100.3(2).[14] Appellants challenged the lawfulness of his ruling dismissing cer-

---

**13.** Point E does not appear in the argument section of Appellants' brief. The claim of error from Point E is also claimed in Point F, however, and the argument for Point E appears to have been subsumed into the argument for Point F as well. Nevertheless, Point E is abandoned because it did not appear in Appellants' argument. *Henson*, 195 S.W.3d at 481; *Houston*, 197 S.W.3d at 205.

**14.** For examples of an administrative hearing officer's discretionary duties in general, see *Lagud v. Kansas City Bd. of Police Comm'rs*, 136 S.W.3d 786, 793 (Mo. banc 2004) (hearing officers have wide discretion to determine scope of cross-examination); *State ex rel. Miss. Lime Co. v. Mo. Air Conservation Comm'n*, 159 S.W.3d 376, 384 (Mo.App.2004) (hearing officer has broad discretion to control discovery and did not abuse discretion in ordering release of confidential information subject to protective order); *Daly v. State Tax Comm'n*, 120 S.W.3d 262, 268 (Mo.App.2003) (hearing officer has broad discretion to allow evidence that is not in technical compliance with discovery rules); *Becker v. Mo. Dept. of Corr. and Human Services*, 780 S.W.2d 72, 78 (Mo.App.1989) (hearing officer has broad discretion to grant continuance).

tain claims, and the circuit court affirmed that ruling.

The Commission, on the other hand, exercises a different discretion in that it has a wide array of duties to perform in accordance with the purposes of the Missouri Air Conservation Law. *See* § 643.050. Particularly, though, in issuing its final orders and decisions, it has discretion to weigh all the equities, advantages, and disadvantages to those involved. § 643.050.5. The record reveals that the circuit court *did* not have the opportunity to review the lawfulness of the Commission's exercise of discretion in relation to these claims, because the Commission's actions were not challenged in the Petition for Review. The Petition for Review asked the circuit court to review only the actions of the Hearing Officer. Therefore, the claims in Points C through G were not preserved for appeal. *See Edwards*, 85 S.W.3d at 21; *Ruffin*, 849 S.W.2d at 114. Points C, D, E, F, and G are dismissed.

### ii) *Point P—Claim that Commission Erred in its Decision and Order by Designating Kendall Hale and Kyra Moore as Expert Witnesses*

 Appellants' Point P claims: "The Commission committed reversible legal error in accepting MDNR employees Kyra Moore and Kendall Hale as expert witnesses in its Order when those witnesses were never designated as experts or admitted as such in the underlying evidentiary hearing." This point fails to "state concisely the legal reasons for the [Appel-

lants'] claim of reversible error" as required by Rule 84.04(d)(2)(B). Points on appeal that fail to comply with Rule 84.04(d) present nothing for review. *Murphy v. Shur*, 6 S.W.3d 207, 209 (Mo.App. 1999).

In addition, the argument portion of Appellants' brief in support of this point consists, in its entirety, of the following:

> The Commission's Order and Decision at 10–11 (Appendix at 61–62), found that Kyra Moore and Kendall Hale were expert witnesses. These employees of MDNR were involved in the permitting process and testified at the contested case hearing. MDNR, however, never offered or attempted to qualify them as expert witnesses. Accordingly, the Commission's designation of them as expert witnesses constitutes an error of law.

 Appellants fail to cite any legal authority supporting their claim that this action by the Commission "constitutes an error of law." [15] Appellants have the obligation to cite to appropriate and available legal precedent to support their points-relied-on. *In re Marriage of Buchholz*, 166 S.W.3d 146, 160 (Mo.App.2005). Where no legal authority supporting a point exists, an appellant must specify why citations are unavailable. *Id.* Failure to cite the law or explain the absence of the law preserves nothing for review. *Patterson v. Waterman*, 96 S.W.3d 177, 178 (Mo. App.2003).

---

**15.** Following its point-relied-on, Appellants list § 536.140 and *Cabool v. Missouri State Bd.*, 689 S.W.2d 51, 54–55 (Mo.1985), as "Authority." Such abstract listing of "Authority" as required by Rule 84.04(d)(5) does not satisfy the requirement to include a legal reason for the claimed error in the point-relied-on as required by Rule 84.04(d)(2)(B). It also does not satisfy the requirement that an appellant develop a point-relied-on in the argument portion of his brief by citation to relevant authority with an explanation as to how it applies to the facts of the case. *Mortgage Electronic Registration Systems, Inc. v. Williams–Pelton*, 196 S.W.3d 50, 52 (Mo.App. 2005). We have *ex gratia* reviewed both cited "authorities" and find nothing in either to support Appellants' claim of error.

Having failed to preserve anything for appellate review, either by their point-relied-on or their argument, Point P is dismissed.

#### b) *Emission Limitation Issues*

Missouri law requires all air pollution sources to obtain construction permits from MDNR before beginning construction. § 643.075. MDNR administers its construction permitting program through administrative regulations it has adopted, specifically, 10 CSR 10–6.060. Missouri regulations define the specific requirements for various types of construction permits depending on the air quality in the area of the source and on the potential air pollution emission rates from the source. *Id.* The Springfield area is designated as an "attainment area" for all regulated pollutants, meaning that the air quality in the area is in compliance with state and federal air quality standards. The federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401, *et seq.*, requires states to adopt regulatory programs for issuing a certain type of construction permit to "major sources" located in attainment areas known as a "Prevention of Significant Deterioration" ("PSD") permit, as applied for by City Utilities in the instant case. Missouri has adopted a regulatory program for PSD permits, which the EPA has approved. 10 CSR 10–6.060(8). Thus, Missouri, through its delegated agency MDNR, issues PSD permits to qualifying sources pursuant to the requirements of Missouri's regulations.

PSD permits require a number of demonstrations and conditions in order to ensure protection of current air quality levels, most of which are not at issue in this

appeal. Among the many PSD requirements, and the central focus of the claims in this appeal, is the permittee's use of the "best available control technology," or "BACT," "for each pollutant that it would emit in a significant amount." 10 CSR 6.060.

BACT is defined as:

Best available control technology (BACT)—An emission limitation (including a visible emission limit) based on the maximum degree of reduction for each pollutant which would be emitted from any proposed installation or major modification which the director on a case-by-case basis, taking into account energy, environmental and economic impacts and other costs, determines is achievable for the installation or major modification through application of production processes or available methods, systems and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of the pollutant.

10 CSR 10–6.020(2)(B)5.

MDNR's general process for determining BACT is to use a "top-down" method [16] to identify possible control technology options, and then to review those controls based on environmental, economic, and energy impact. MDNR considers general steps of a "top-down" BACT analysis to be: (1) identification of possible control technologies; (2) analyzing whether such technologies are technically feasible; (3) eliminating technologies that are not technically feasible; and (4) evaluating economic, environmental, and energy impacts for the remaining control options, resulting in selection of a control requirement and

---

16. "Nothing in the [CAA] or its implementing regulations mandates top-down analysis. See 42 U.S.C. § 7479(3); 40 CFR § 52.21(j) (2002)." *Alaska Dept. of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 476, 124 S.Ct. 983, 995 n. 7, 157 L.Ed.2d 967 (2004). We have not been cited to any legal authority mandating the use of the top-down analysis under the Missouri Air Conservation Law contained in Chapter 643 or its implementing regulations.

an appropriate emission limit. If the "top," or most effective, option is eliminated after consideration of economic, environmental, and energy impacts, the same process would be repeated for the remaining options if necessary or appropriate. There is no requirement that each step in the analysis be documented in any manner. MDNR uses these principles as a guide in conducting the BACT analysis for larger sources of emissions, but does not necessarily use the top-down method for smaller or insignificant sources of emissions.

The BACT analysis ultimately results in setting an emission limit for a particular pollutant based on the application of control technology found to be feasible for the particular unit and that particular pollutant. In setting the emission limit, MDNR practice is to apply a margin of safety to the anticipated level of emissions from the source. Appellants' remaining points on appeal challenge the Decision and Order related to the sulfur dioxide ($SO_2$) emission limitation in the Permit (Points I through K), the nitrogen oxides ($NO_X$) emission limitation in the Permit (Points L through N), the cooling tower emission limitation in the Permit (Point O), and the lack of a visible emission limitation in the Permit (Point H). We will address the points in this order.

### i) *Sulfur Dioxide (SO₂)*

Sulfur dioxide ($SO_2$) is a pollutant subject to the provisions of the PSD permitting process and is the result of the sulfur content in the coal. "Flue Gas Desulphurization" ("FGD") is a control technology for the removal of $SO_2$. There are two major types of FGD—wet and dry. In general, pulverized coal-fired boilers burning low-sulfur coal, such as Powder River Basin ("PRB") coal, may use dry FGD, while boilers burning high-sulfur coals,

such as eastern bituminous coal, must use wet FGD. City Utilities' Application proposed the use of PRB (low-sulfur) coal and to control $SO_2$ by using dry FGD as the control technology with an emission limitation of 0.12 pounds per million British Thermal Units ("lb/mmBtu"). Based upon the projected sulfur content of the PRB coal as provided by City Utilities, MDNR issued the Draft Permit requiring dry FGD as the control technology and setting the emission limitation for $SO_2$ at 0.12 lb/mmBtu. However, during the comment period for the Draft Permit, the EPA filed a comment questioning the projected sulfur content figure for PRB coal as provided by City Utilities and supplied MDNR additional information indicating that the projected sulfur content of the PRB coal would actually be lower than that projected by City Utilities. In response to these comments and the additional information, MDNR reduced the emission limitation for $SO_2$ in the Permit to 0.095 lb/mmBtu.

Appellants' three points related to $SO_2$ challenge both the use of dry FGD as the appropriate control technology (Point I) and the emission limitation based thereon set in the Permit (Points J and K).

### (1) *Point I—Use of Dry FGD as the Basis for BACT Emission Limitation for SO₂*

Both MDNR and City Utilities agreed that the top control technology, in terms of $SO_2$ removal efficiency, is wet FGD. According to MDNR, wet FGD has a 96% removal efficiency, while dry FGD has a 92% removal efficiency. However, MDNR concluded that dry FGD was BACT for this particular pulverized coal-fired boiler, based upon a review of the energy and environmental impacts of wet versus dry FGD.[17] In terms of energy impact, MDNR

**17.** City Utilities also contended that there

were economic impacts which supported the

considered that wet FGD uses more energy or electricity in order to operate and, consequently, City Utilities would have less electricity available to provide its customers. Or conversely, City Utilities would have to burn more coal containing sulfur, thereby creating additional $SO_2$ to generate the additional electricity necessary to operate the wet FGD just to achieve the same net electricity output as with dry FGD. The environmental impacts considered by MDNR included that dry FGD does a better job controlling most hazardous air pollutants and particulate matter, and that dry FGD, unlike wet FGD, does not produce a wastewater stream that would require disposal.

Appellants claim in Point I that:

The Commission committed reversible *legal error* by concluding that MDNR's collateral impacts analysis justified the use of dry FGD technology over wet FGD technology as the basis for the BACT emission limit for $SO_2$. In making this conclusion, the Commission *legally misapplied* the collateral impacts analysis required under BACT and patently *failed to make the required* factual findings which would have been necessary in order to select dry FGD over wet FGD technology. The Commission also *erred as a matter of law* in relying on a generic negative impacts associated with wet FGD technology instead of impacts unique to the Southwest Unit 2. application [sic] in question.

(Emphasis added).

 While Appellants claim that the Commission committed "legal error," "legally misapplied," "failed to make the required," and "erred as a matter of law," Appellants fail to "state concisely the legal reasons for the [Appellants'] claim of re-

versible error" as required by Rule 84.04(d)(2)(B). Without such, we and the Respondents are left to speculate as to the legal basis for Appellants' claim of error. Is the claimed error the result of a violation of some statute or some agency regulation? Is the legal reason for the claimed error that the Commission's decision is unsupported by competent and substantial evidence upon the whole record; is arbitrary, capricious or unreasonable; or constitutes an abuse of discretion? We do not know, and Appellants' point does not enlighten us. The failure to state any adequate legal reason for reversible error "is a direct violation of the plain wording of Rule 84.04(d)." *Speer v. K & B Leather Co.*, 150 S.W.3d 387, 388 (Mo.App.2004). "It is not sufficient to merely set out what the alleged errors are without stating why." *Id.* (quoting *Landers v. Huffman*, 914 S.W.2d 394, 396[4] (Mo.App.1996)).

 Ordinarily, a defective point-relied-on preserves nothing for appellate review. *Mortgage Elec. Registration Sys., Inc. v. Williams–Pelton*, 196 S.W.3d 50, 51–52 (Mo.App.2005). In an effort to reach the merits of Appellants' point, we have searched the argument portion of Appellants' brief to ascertain any claimed legal reasons supporting Appellants' claim of error under this point. The only legal authorities cited by Appellants under this point and in their argument on this point are *In re Kawaihae Cogeneration Project*, 7 E.A.D. 107, 117 (EAB 1997); *In re Steel Dynamics*, 9 E.A.D. 165, 202 (EAB 2000); *In re General Motors*, 10 E.A.D. 360, 378 (EAB 2002) and NSR Manual at B.29–30, B.47. However, neither the decisions of the Environmental Appeals Board ("EAB") nor the comments contained in the New Source Review Workshop Manual B.2 (Draft Oct. 1990) ("NSR Manual") are con-

use of dry FGD over wet FGD, however, Kendall Hale, on behalf of MDNR, did not consider economic impacts or costs as part of his analysis of BACT for $SO_2$.

trolling or binding legal authority upon the MDNR or the Commission.

The EAB is the final EPA decision-maker on administrative appeals under all major federal environmental statutes that the EPA administers. Appeals from permits issued by the EPA are heard by the EAB. 40 C.F.R. § 124.19. Each state is required to adopt and submit to the EPA a state implementation plan ("SIP"), which provides for implementation, maintenance, and enforcement of national ambient air quality standards and which includes, among other things, a PSD permitting program. 42 U.S.C. § 7401(a). Many states do not have a SIP that has been approved by the EPA. In those jurisdictions, the EPA is the permitting authority, but in almost all of those states, the EPA has delegated its authority to issue PSD permits to the states. 42 U.S.C. § 7401(c). When states with delegated PSD programs, as opposed to states with approved PSD programs (such as Missouri), issue PSD permits, they do so as EPA's agents under the statutes and regulations governing EPA, not in their own right. Accordingly, PSD permit appeals from delegated states are heard by the EAB as well. Thus, appeals heard by the EAB involve the federal statutes and regulations governing the actions of the EPA. However, the EAB has no authority to review any decision of the MDNR or the Commission applying Missouri statutes or regulations under Missouri's approved PSD program under its SIP. While the decisions of the EAB in applying and interpreting federal environmental statutes and regulations may be helpful and even persuasive in applying and interpreting Missouri environmental statutes and regulations, they are not binding or controlling upon the MDNR, the Commission, or the courts of this State.

The NSR Manual was developed by the staff of the New Source Review Section of the EPA. The preface to the NSR Manual provides, in part:

This document was developed for use in conjunction with new source review workshops and training, and to guide permitting officials in the implementation of the new source review (NSR) program. *It is not intended to be an official statement of policy and standards and does not establish binding regulatory requirements; such requirements are contained in the statute, regulations and approved state implementation plans.* Rather, the manual is designed to (1) describe in general terms, and illustrate by examples, the requirements of the new source review regulations and existing policies interpreting those regulations; and (2) provide suggested methods of meeting the regulatory requirements as they have been interpreted by EPA. Should there be any inconsistency between this manual and the regulations (including any interpretational policy statements made pursuant to those regulations), the regulations, interpretations, and policies shall govern.

(Emphasis added). Consequently, as the Commission found in its Decision and Order, MDNR uses the NSR Manual "as guidance but does not follow it as though it were a rule." Appellants have not directed our attention to any authority, and we can find none, indicating that the comments contained in the NSR Manual are binding or controlling upon the MDNR, the Commission, or the courts of this State.

Because the decisions of the EAB and the comments in the NSR Manual are not binding and controlling legal authority supporting Appellants' claim of error in Point I, we are left with Appellants' bare

conclusions of legal error on the part of the Commission without any citation to any law requiring the Commission to take any action other than what it did in its Decision and Order. As such, Appellants have failed to preserve anything for appellate review. *Mortgage Elect. Registration Sys., Inc.*, 196 S.W.3d at 51–52. Point I is dismissed.

### (2) *Points J and K–Emission Limitation for SO$_2$*

 Appellants' Point J asserts that the "Commission committed reversible legal error by justifying MDNR's BACT emission limit for SO$_2$ based solely on a comparison to emission limits imposed by other permits instead of conducting the proper and legally required BACT analysis." Although Appellants are contending that the Commission committed a "legal error," they have once again failed to include in their point any legal reason supporting this claim. Rule 84.04(d)(2)(B). Nevertheless, as required by Rule 84.04(d)(5), Appellants have listed 10 CSR 10–6.020(2)(B)(5) and 42 U.S.C. § 7479(3) as authority upon which they rely in this point. The former is Missouri's regulatory definition of BACT, and the latter is the federal statutory definition of BACT under the CAA.[18] However, Appellants do not mention these citations, or for that matter any other citation to legal authority, in the argument portion of their brief supporting this point. In other words, they have com-

---

**18.** 10 CSR 10–6.020(2)(B)(5) provides:

Best available control technology (BACT)— An emission limitation (including a visible emission limit) based on the maximum degree of reduction for each pollutant which would be emitted from any proposed installation or major modification which the director on a case-by-case basis, taking into account energy, environmental and economic impacts and other costs, determines is achievable for the installation or major modification through application of production processes or available methods, systems and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of the pollutant. In no event shall application of BACT result in emissions of any pollutant which would exceed the emissions allowed by any applicable emissions control regulation, including New Source Performance Standards established in 10 CSR 10–6.070 and 40 CFR part 60 and National Emissions Standards for Hazardous Pollutants established in 10 CSR 10–6.080 and 40 CFR part 61. If the director determines that technological or economic limitations on the application of measurement methodology to a particular source operation would make the imposition of an emission limitation infeasible, a design, equipment, work practice, operational standard or combination of these may be prescribed instead to require the application of BACT.

This standard, to the degree possible, shall set forth the emission reduction achievable by implementation of the design, equipment, work practice or operation and shall provide for compliance by means which achieve equivalent results.

42 U.S.C.A. § 7479(3) provides:

The term "best available control technology" means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of "best available control technology" result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990.

pletely failed to connect either of these cited authorities to the claimed error by the Commission in either their point-relied-on or in the argument supporting that point. There is no assertion or argument that the Missouri regulatory definition of BACT or the federal statutory definition of BACT legally required the Commission to render a decision different from that in its Decision and Order. Even if we were inclined, which we are not, to consider the citation to these authorities after the point-relied-on as satisfaction of the requirement under Rule 84.04(d)(2)(B) for stating the legal reason for the claimed error, we are still confronted with the problem that Appellants have utterly and completely failed to develop or advance that legal reason in the argument portion of their brief purporting to support this point. Points-relied-on that are not developed in the argument are considered abandoned and preserve nothing for appellate review. *Haynam v. Laclede Elec. Coop., Inc.*, 889 S.W.2d 148, 155 (Mo.App.1994); *Mortgage Elec. Registration Sys., Inc.*, 196 S.W.3d at 52. Point J is dismissed.

▆▆▆ Appellants' Point K asserts that the Commission's decision to uphold the Permit with a $SO_2$ emission limitation of 0.095 lb/mmBtu, was arbitrary and unreasonable in that:

> MDNR ignored without adequate explanation important data submitted by EPA concerning the likely composition of the coal that would be burned in the proposed unit and unconditionally adopted information supplied by the permittee on this rate without any verification or information relating to how this

estimate was derived or how accurate it was.

Appellants take issue with the Commission's description of the BACT analysis for $SO_2$ as "well reasoned and supported by information received and considered by Mr. Hale." Their complaint is that MDNR based the emission rate simply on an assumed value for the sulfur content of coal that will be burned at Southwest 2, "without question in the face of evidence from EPA that the number is grossly inflated[.]"[19] In other words, Appellants argue both that the Commission failed to consider EPA's data supporting the sulfur content of the coal and that EPA's data is the only substantial evidence in the record supporting the sulfur content of the coal. Both arguments have no merit. The Commission fully considered the EPA data, and there is substantial evidence in the record supporting the Commission's affirmation of MDNR's determination.

The $SO_2$ emission rate in the Permit is based on two factors: the assumed "uncontrolled" emission rate, and the assumed control efficiency of the add-on control technology—in this case the dry FGD. Appellants complain that the assumed uncontrolled emission rate is based on a value for the sulfur content of coal that is higher than what they believe will be likely.

Contrary to Appellants' assertions that MDNR had no basis to assume the sulfur value it relied on in setting the $SO_2$ limit, MDNR thoroughly explained its rationale for agreeing with City Utilities' proposed sulfur content values, based on an anomaly in the data used by the EPA and the fluctuation in the sulfur content in coal from the Powder River Basin. MDNR's

---

**19.** Although Appellants fail to cite any supporting legal authority, apparently they are relying upon the legal principal articulated in *Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892 (Mo.App.1995), that: "an

agency which completely fails to consider an important aspect or factor of the issue before it may also be found to have acted arbitrarily and capriciously." *See also Hundley v. Wenzel*, 59 S.W.3d 1, 8 (Mo.App.2001).

evaluation in its response to the EPA comment showed that EPA's value was not premised upon an accurate comparison in that it included data only from uncontrolled boilers that have a significant legal and financial interest in paying a premium price for low-sulfur coal and that City Utilities' proposed value was within the range of sulfur values for PRB coal. MDNR responded that:

EPA makes the case in the comment that a more representative inlet $SO_2$ concentration would be in the range of 0.84 to 0.93 lb/mmBtu. This range is based upon CEMS [Continuous emission monitoring system] data reported for all uncontrolled NSPS Subpart D utility boilers in Region VII. [MDNR] feels that this data does not represent the entire utility industry as a whole due to the fact that it only looks at uncontrolled boilers. Those boilers which are uncontrolled have to demonstrate compliance with the NSPS Subpart D limits along with the acid rain cap and trade program. In order to demonstrate compliance, many of these companies choose to burn coal with a low[-]sulfur content rather than install add-on controls, thereby narrowing the choices as to what coal can be purchased. Those companies whose boilers have add-on $SO_2$ controls have a wider selection from which to purchase coal.

It is the [MDNR]'s belief that a baseline inlet concentration of 1.15 lb/mmBtu accurately reflects the typical quality of coal which City Utilities can and will be purchasing. This number is in line with limits placed on other recently permitted pulverized coal fired boiler [sic] which will primarily be burning Powder River Basin [PRB] coal.

In addition, the variability in sulfur content was supported by testimony at the hearing from City Utilities' Manager of Generation Projects, Dale Hicks, who explained that sulfur value fluctuates among each mine within the Powder River Basin, and that City Utilities needs to maintain flexibility in the future to account for this variability. The factual findings in the Decision and Order indicate that the Commission recognized and considered: (1) the original $SO_2$ limit in the draft permit; (2) EPA's comments to the draft permit; (3) City Utilities' and MDNR's responses to those comments; and (4) the final emission limit set in the Permit. There is nothing in the record to indicate that the Commission "ignored" the data supplied by the EPA, as alleged by Appellants.

The EPA did not challenge either of MDNR's assertions in its response on this issue. Without such a challenge, the Commission could have reasonably inferred that the EPA concurred in MDNR's analysis as stated in its response to the EPA's comments.

The above also demonstrates the substantial and competent evidence in the record supporting the Commission's finding regarding the assumed sulfur content in the coal to be used at Southwest 2, and thus in the Commission's adoption of MDNR's $SO_2$ emission rate in the Permit. Where an administrative body's decision is based on substantial evidence, it is not arbitrary and unreasonable. *Mertzlufft v. Civil Service Comm'n of St. Louis,* 85 S.W.3d 63, 66 (Mo.App.2002); *Abeln v. State Tax Comm'n of Missouri,* 793 S.W.2d 490, 491 (Mo.App.1990); *Quincy Soybean Co., Inc. v. Lowe,* 773 S.W.2d 503, 505 (Mo.App.1989). Point K is denied.

### ii) *Nitrogen Oxides (NO$_x$)*

Appellants' next three points (points L through N) challenge the Commission's affirmation of the $NO_x$ limitation in the Permit of 0.08 lb/mmBtu on a 30–day rolling average. The $NO_x$ control technology for

Southwest 2 is "selective catalytic reduction" ("SCR"), low $NO_x$ burners and good combustion practices. SCR is widely used in utility and other combustion applications for $NO_x$ control. Appellants do not challenge the specified control technologies as inappropriate, but rather only challenge the emission limitation as being too high. Point L challenges the $NO_x$ emission limitation based upon MDNR's alleged failure to consider information contained in comments made by Appellant Sierra Club to the Draft Permit.[20] Point M claims that the $NO_x$ emission limitation lacked any rational basis or support.[21] Point N claims that the $NO_x$ emission limitation is clearly erroneous, is unsupported by substantial evidence, and is arbitrary and capricious.[22]

■■■ The argument portion of Appellants' brief related to each of these points is essentially void of any citation to relevant legal authority. The lone citation to legal authority consists of "*See generally In re Brooklyn Navy Yard Resource Recovery Facility*, 3 E.A.D. at 875" at the conclusion of the argument for Point L. Besides having no controlling or binding authority on the Commission as previously discussed, this EAB decision deals with the EPA's failure to consider the possible use of materials separation as a type of control technology for $NO_x$ and adds nothing to support Appellants' point concerning the emission limitation based upon an admittedly appropriate control technology. Without citation to any relevant legal authority or any explanation as to why such authority is not available, Appellants have failed to preserve anything for review. *Haynam*, 889 S.W.2d at 155; *Mortgage Elec. Registration Sys., Inc.*, 196 S.W.3d at 52. We have, however, *ex gratia* reviewed the record to determine whether the decision of the Commission in affirming the $NO_x$ limitation in the Permit is "unsupported by competent and substantial evidence upon the whole record," as proscribed by § 536.140.2(3), or is arbitrary, capricious, or unreasonable as proscribed by § 536.140.2(6).[23] We find neither.

20. Point L in its entirety reads:
 The Commission committed reversible legal error in setting the $NO_x$ BACT limitation because, in doing so, the Commission approved and adopted MDNR's legally erroneous analysis of this limitation. MDNR underestimated the effectiveness of the control technology selected to control $NO_x$ as a result of failure to [sic] publically [sic] available data submitted in Sierra Club's comments concerning the permit and its unreasonable decision to disregard other technical information on other facilities showing that lower limits were "achievable" for $NO_x$ based on its mis-application of the legal definition of the term BACT.

21. Point M in its entirety reads: "The Commission committed reversible legal error in setting the $NO_x$ BACT limitation because, in doing so, the Commission approved and adopted MDNR BACT limitation for this pollutant which was inexplicitly inconsistent with MDNR's own emission assumptions and therefore lacked any rational basis or support."

22. Point N in its entirety reads:

 The Commission committed reversible legal error in setting the $NO_x$ BACT limitation because, in doing so, the Commission approved and adopted MDNR BACT analysis for this pollutant which failed to quantify perceived incremental costs and failed to demonstrate, as was MDNR's burden, the basis for making any assumption that incremental costs would have increased if a lower $NO_x$ emission limitation was set. For these reasons, the Commission's determination to set the $NO_x$ emission limit at 0.08lbs/mmBtu constitutes an error of law, is clearly erroneous, and is unsupported by substantial evidence, and is arbitrary and capricious.

23. Appellants have cited no authority supporting their presumption that the appropriate standard of review is lack of "rational basis or support" or "clearly erroneous" as alleged in their points. Had Appellants complied with Rule 84.04(e) which provides, in part, "[t]he argument shall also include a concise state-

### (1) NO$_x$ Emission Limitation is Supported by Substantial Evidence

■ In setting the NO$_x$ limitation, the MDNR considered its review of permits for pulverized coal facilities issued in other states. These permits at the time were also requiring a 0.08 lb/mmBtu rate, or less stringent rates. MDNR also considered the analysis of the capability of SCR to reduce NO$_x$ in a pulverized coal-fired boiler burning low-sulfur coal such as PRB. The record documents that City Utilities and MDNR thoroughly researched the experience of other similar facilities burning PRB coal, and found that meeting a lower limit could require additional maintenance on the SCR at significantly higher costs.[24]

In addition, MDNR relied on its experience and knowledge of the recent performance of SCR at another Missouri utility facility, the KCP & L Hawthorn plant. Hawthorn was required in its air permit to utilize SCR, low-NO$_x$ burners and good combustion practices to meet an emission rate of 0.08 lb/mmBtu, after the first three years of operation.[25] But even after nearly three years of attempting to attain the 0.08 lb/mmBtu limit, the Hawthorn plant experienced significant difficulty in achieving that limit, due to unexpected fouling and deterioration of the SCR components resulting specifically from the use of low-sulfur coal.

Based on the experience at Hawthorn, City Utilities and MDNR concluded that improvements in design of the SCR could be made to allow Southwest 2 to consistently achieve a rate of 0.08 lb/mmBtu. However, they concluded that substantially greater maintenance costs would be required to achieve a rate of 0.07 lb/mmBtu as a 30–day average. As stated by MDNR's Kyra Moore, "Since I was going through a process at the same time as the City Utilities['] permit was being drafted with a facility that was demonstrating great difficulty at the time meeting a 0.08 pounds of NO$_x$ per million Btu, it was very hard for me to require another source to meet a lower limit when I wasn't even sure Kansas City Power & Light could meet the 0.08."

The setting of an emission limitation to define BACT is a discretionary act. Under the BACT definition, the BACT emission rate must be "achievable," but "achievable" does not mean a permit limit that mirrors the lowest possible emission rate ever achieved in practice, as Appellants would argue. If this were so, the rule would simply require MDNR to find the lowest possible emission rate being achieved anywhere and set that as the BACT limit. "Achievable" must be read in the context of the BACT rule: the BACT emission rate is that "which the director *on a case-by-case basis*, taking into account energy, environmental and economic impacts and other costs, determines is achievable for the installation." 10 CSR 10–6.020(B)5 (emphasis added). Thus, MDNR interprets "achievable" to mean that which is reasonably expected to be

---

ment of the applicable standard of review for each claim of error[,]" they would have realized that the allegations in their points did not coincide with the applicable standard of review as set forth in § 536.140.

**24.** City Utilities' cost analysis showed that the incremental cost to meet a limit of 0.07 lb/mmBtu would be $31,177 per additional ton of NO$_x$ removed, based on the assumption

that the SCR catalyst would need to be replaced on a more frequent, 18–month basis, compared to a 3–year basis assumed necessary to meet a 0.08 lb/mmBtu limit.

**25.** The PSD permit issued to Hawthorn allowed it to meet a limit of 0.12 lb/mmBtu for the first three years of operation.

met by the facility over the life of the operation.

▆ There is a distinction between what is "technically" or theoretically achievable, and what is "achievable" after considering costs, duration of operations, operational variability, and other case-by-case factors. MDNR crafted the permit limit in a way that the facility can meet it over the life of the operation, and therefore built into the limit a "safety factor" to allow for operational variability. Indeed, the EAB permitting cases, although not binding or controlling upon the Commission, recognize that permitting agencies should include a safety factor when setting permit limits. Permitting agencies have the discretion to set BACT limits at levels that do not necessarily reflect the highest possible control efficiencies but, rather, will allow permitees to achieve compliance on a consistent basis. *See In re Knauf Fiber Glass*, 9 E.A.D. 1, 15, 2000 WL 291422 (E.P.A.EAB) ("There is nothing inherently wrong with setting an emission limitation that takes into account a reasonable safety factor"); *In re Masonite Corp.*, 5 E.A.D. 551, 560–61 1994 WL 615380 (E.P.A.). Thus, actual lower emissions at other facilities do not dictate a limit to be set in a permit after accounting for long-term compliance and safety factors.

▆ While we generally give deference to an agency decision, this is particularly so regarding matters of regulatory interpretation and the application of those regulations to scientific and technical data. *Morton*, 944 S.W.2d at 236–37. Given the foregoing, we cannot say that the $NO_x$ emission limitation in the Permit is unsupported by competent and substantial evidence upon the whole record.

### (2) *$NO_x$ Emission Limitation is not Arbitrary or Capricious*

▆ As we have previously stated, as a general rule, where an administrative

body's decision is based on substantial evidence, it is not arbitrary and unreasonable. *Mertzlufft*, 85 S.W.3d at 66; *Abeln*, 793 S.W.2d at 491; *Quincy Soybean Co., Inc.*, 773 S.W.2d at 505. One exception to the general rule occurs when an agency completely fails to consider an important aspect or factor of an issue before it. *Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 892 (Mo.App.1995); *Hundley v. Wenzel*, 59 S.W.3d 1, 8 (Mo.App.2001).

▆ Whether MDNR considered every one of Appellants' examples of lower-emitting facilities provided in their comments to the Draft Permit as argued by Appellants in Point L, is irrelevant to the question of whether the Commission's decision was arbitrary and capricious. During the hearing, Appellants had every opportunity to offer into evidence their evidentiary support for a lower emission rate. In addition, Appellants' comments to the Draft Permit were before the Commission. The Decision and Order specifically found that the Appellants' evidence on its claims as related to the $NO_x$ emission limitation failed to support their position and was unpersuasive. The weight to be given to any particular evidence is a decision that is within the purview of the Commission. Where, as here, the action of an administrative agency involves administrative discretion, we may not weigh the evidence. *Greene County Concerned Citizens v. Bd. of Zoning Adjustment of Greene County*, 873 S.W.2d 246, 254 (Mo. App.1994); *Lorenz v. City of Florissant, Mo.*, 747 S.W.2d 222, 226 (Mo.App.1988). Also where, as here, the evidence before an agency would warrant either of two opposing conclusions, we are bound by the agency's findings. *Morton*, 944 S.W.2d at 236.

Appellants insinuate that because "[t]he Commission's opinion addressed only the

Haber Report and the Texas regulations[,]" the Commission failed to consider the rest of Appellants' evidence related to the NO$_x$ emission rate. However, the Decision and Order makes it clear that the explicit mention and review of particular items in the Decision and Order is an illustration of the general tenor of the rest of Appellants' claims. The latter statement indicates that the Commission considered all of Appellants' evidence and simply rejected it as unpersuasive. Appellants have cited us to no authority, and we have found none, that requires the Commission to mention and review every individual piece of a party's evidence in its written decision. The Decision and Order clearly demonstrates that the Commission considered all of the evidence and all issues related to the evidence before it, and Appellants have not established that the Commission failed to consider any important aspect or factor before it related to the NO$_x$ emission limitation in the Permit. As such, and because the decision is otherwise supported by substantial evidence, we cannot say that the NO$_x$ emission limitation as affirmed by the Decision and Order is arbitrary and capricious. Points L, M and N are denied.

### iii) *Cooling Tower*

The cooling tower for the boiler stack has the potential to emit particulate matter less than 10 microns in diameter ("PM$_{10}$"), or in general terms, dust. However, the cooling tower's potential to emit this pollutant is insignificant when compared with overall emissions from the project. Because of this insignificance, many permits do not even contain an emission limitation for the cooling tower. Nevertheless, MDNR performed a BACT analysis for the cooling tower. But, because of the insignificance in the amount of the potential to emit, the availability of only one control technology—high efficiency drift eliminators, and the seeming consensus of other permits setting a limitation in the range of 0.001% drift, MDNR did not perform a full "top-down" BACT analysis. The other permits reviewed in the BACT analysis and the cooling tower limits set in each were as follows: Mid American (Iowa)—none set; Whelan (Nebraska)—0.002%; Hawthorn (Missouri)—none set; Prairie State (Illinois)—0.0005%; and Thoroughbred (Kentucky) 0.002%. The Commission determined that the use of high efficiency drift eliminators with a limitation of 0.001% drift for the cooling tower as required in the Permit was BACT.

■■■ Appellants' Point O challenges the limitation of 0.001% as being unsupported by substantial evidence and as being arbitrary and capricious in that: (1) a full "top-down" analysis was not performed; and (2) the MDNR failed to set the limit at 0.0005% drift in accordance with the Prairie State facility permit, being the lowest limitation reviewed. We first observe that Appellants' argument supporting this point contains no citation to any legal authority supporting their claim of error and fails to provide any explanation for this absence. As previously noted, without citation to any relevant legal authority or any explanation as to why such authority is not available, Appellants have failed to preserve anything for review. *Haynam*, 889 S.W.2d at 155; *Mortgage Elec. Registration Systems, Inc.*, 196 S.W.3d at 52.

■■■ This lack of citation to relevant legal authority on this point is extremely troublesome. Appellants have failed to establish any legal requirement that MDNR perform a BACT analysis for the cooling tower in the first instance. If it is not required, then the Commission could not have legally erred in affirming MDNR's voluntary assumption of this task. Even assuming that MDNR was required to per-

form a BACT analysis, Appellants have not cited any legal authority that MDNR was required to perform a full "top-down" analysis. In fact, they could not do so because it is not legally mandated. *Alaska Dept. of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 476, 124 S.Ct. 983, 995 n. 7, 157 L.Ed.2d 967 (2004). Without being mandated, we are at a loss to discern how the Commission legally erred because the MDNR did not perform a full "top-down" analysis. Likewise, Appellants fail to cite us to any legal authority that MDNR was required to mimic the Prairie State emission limitation to the exclusion of the consideration of all other permits it reviewed.

It appears that Appellants are simply asking us to substitute their discretion for that exercised by MDNR and affirmed by the Commission. In making its BACT determination for the cooling tower, MDNR was confronted with evidence supporting a limitation in a range from zero (none set) to as high as 0.002% drift. It exercised its discretion based upon such evidence and set the limit at 0.001% drift. This limit was lower than four of the five other permits it reviewed. The fact that one other permit had a lower limit does not diminish the other substantial evidence supporting the limit set. Likewise, the fact that MDNR considered the Prairie State limit and rejected it does not mean that its decision, otherwise based upon substantial evidence, was arbitrary and capricious. *See Mertzlufft*, 85 S.W.3d at 66; *Abeln*, 793 S.W.2d at 491; *Quincy Soybean Co., Inc.*, 773 S.W.2d at 505; *Barry Serv. Agency Co.*, 891 S.W.2d at 892; *Hundley*, 59 S.W.3d at 8. Point O is denied.

#### iv) Lack of any Visible Emission Limitations in the Permit

In order to present Appellants' Point H in an understandable manner, we must define the terms "visible emission," "opacity," and "emission limitation," and consider their relationship to one another. A "visible emission" is defined as "[a]ny discharge of an air contaminant, including condensibles, which reduces the transmission of light or obscures the view of an object in the background." 10 CSR 10–6.020(2)(V)(8).

"Opacity" is defined as:

The extent to which airborne material obstructs the transmission of incident light and obscures the visual background. Opacity is stated as a percentage of light obstructed and can be measured by a continuous opacity monitoring system or a trained observer. An opacity of one hundred percent (100%) represents a condition in which no light is transmitted, and the background is completely obscured.

10 CSR 10–6.020(2)(O)(3). Thus, opacity is simply a method of stating the level (from 0% to 100%) by which a visible emission obstructs the transmission of light and obscures the visual background. So, a limit upon a "visible emission" of a pollutant would be stated as a percentage of "opacity"; for example, the visible emission of $PM_{10}$ may not exceed X% opacity (where X is a number between 0 and 100).

An "emission limitation" is defined as: "A regulatory requirement, permit condition or consent agreement which limits the quantity, rate or concentration of emissions on a continuous basis, *including any requirement which limits the level of opacity*, prescribes equipment, sets fuel specifications or prescribes operation or maintenance procedures for an installation to assure continuous emission reduction." 10 CSR 10–6.020(2)(E)(3) (Emphasis added). Because a "visible emission" limit is stated in terms of the level of "opacity," and by definition an "emission limitation" includes any "requirement which limits the

level of opacity," the only logical conclusion is that a "visible emission limit" is an "emission limitation."

Appellants' point H asserts that the Commission erred in affirming MDNR's issuance of the Permit because MDNR was legally required as part of its BACT analysis to set a visible emission limit for each pollutant emitted and that it failed to do so.[26] Appellants base this claim of error upon the regulatory definition of BACT, which provides, in relevant part: "Best available control technology (BACT)—An emission limitation (*including a visible emission limit*) based on the maximum degree of reduction for each pollutant which would be emitted[.]" 10 CSR 10–6.020(2)(B)5 (Emphasis added). Appellants assert that "[t]he parenthetical in the BACT definition ["](including a visible emission limit)["] means that the BACT emission limitations *must* contain [visible emission limits]." Based upon this assertion, they contend: "Thus, for any pollutant for which a BACT analysis is required, *see* 10 CSR 10–6.060(8)(B), the BACT emission limit must include, at a minimum, [a visible emission limit] as well as a limit on the 'quantity, rate or concentration' of emissions on a continuous basis."

On the other hand, MDNR interprets its regulation to mean that a BACT limit may in certain instances be expressed as a visible emission limit, when necessary. In other words, the parenthetical is to remind the regulatory agency that, under certain circumstances, a limit on visible emissions for a particular pollutant may be an appropriate emission limitation rather than one based upon some other type of measurement such as quantity, rate or concentration. Under this interpretation, a visible emission limit would not be required for all regulated pollutants.

We have historically given deference to an agency's interpretation of its own regulation. *Collins v. Dept. of Social Servs., Family Support Div.*, 141 S.W.3d 501, 504 (Mo.App.2004); *Morton*, 944 S.W.2d at 238; *Willard v. Red Lobster*, 926 S.W.2d 550, 553 (Mo.App.1996); *State ex rel. Webster v. Mo. Resource Recovery, Inc.*, 825 S.W.2d 916, 931 (Mo.App.1992). This rule has been questioned recently by the Western District of our Court, noting "it would be inappropriate for a court to defer to an agency's interpretation of its own regulation that was in any way expanding upon, narrowing, or otherwise inconsistent with the plain and ordinary meaning of the words used in the regulation." *Dept. of Social Servs., Div. of Med. Servs. v. Senior Citizens Nursing Home Dist. of Ray County*, 224 S.W.3d 1, 14 (Mo.App. W.D. 2007). Given this caution, we examine the BACT definition, 10 CSR 10–6.020(2)(B)5, to determine whether the agency's interpretation is consistent with the words used therein, giving each its plain and ordinary

---

**26.** Some confusion on this issue has been generated by Appellants' use of the terms "opacity standard" and "opacity limit." Neither phrase is defined in Chapter 643 or in its implementing regulations. *See* 10 CSR 10–6.020. While Appellants may have used these phrases synonymously with "visible emission limit," it is clear from the record that they were understood by the other parties and the Commission as a claim that the Permit must contain an overall limitation on opacity based upon a BACT analysis whether the level of opacity was caused by one particular pollu-

tant, a combination of pollutants, or otherwise. The Commission clearly found in its Decision and Order that no such overarching limitation on opacity by a BACT analysis was required. This determination was not challenged by Appellants in their Petition for Review, and thus cannot be challenged in this appeal. *See Edwards*, 85 S.W.3d at 21; *Ruffin*, 849 S.W.2d at 114. For purposes of clarity in this opinion, we will not use the undefined terms "opacity standard" or "opacity limit."

meaning. *Id.; (citing Teague v. Mo. Gaming Comm'n,* 127 S.W.3d 679, 686 (Mo.App.2003). Reading the words in their proper grammatical context, *Brooks v. State,* 128 S.W.3d 844, 847 (Mo. banc 2004), we begin by considering the parenthetical context of the phrase "including a visible emission limit." *See also Keller v. Marion County Ambulance Dist.,* 820 S.W.2d 301, 302 (Mo. banc 1991) ("Context determines meaning.").

 Parentheses are used "[t]o set off matter not intended to be part of the main statement" and "[t]o enclose any explanatory word not a part of a written or printed statement." *Government Printing Office Style Manual* §§ 8.91 and 8.93 (2000). "Parentheses should be used ... to enclose parenthetical material that is only remotely connected with the content ... or to enclose incidental explanatory matter." *Webster's New World English Grammar Handbook* 170 (2002). In other words, parentheses "are used in pairs to enclose matter that is helpful but not essential." *The Redbook, A Manual on Legal Style* § 1.33 (2002). Consequently, the meaning of the words within the parentheses should be considered as incidental explanatory matter which is not a part of, or at least is not essential to, the main statement.

 In this grammatical context, the plain and ordinary meaning of the words "including a visible emission limit" becomes clear; they incidentally and helpfully explain that by definition an "emission limitation" includes a visible emission limit. This is consistent with MDNR's interpretation of the rule. Likewise, Appellants' argument that the parenthetical phrase *adds* a condition to the regulation that every emission limitation must include a visible emission limit, is inconsistent with the purpose of a parenthetical phrase to provide non-essential information.

MDNR's interpretation of the rule is also consistent with the fact that some pollutants, such as carbon monoxide, are not visible. Appellants' interpretation of the rule would lead to the absurd result of requiring a visible emission limit for an invisible pollutant. In construing the plain and ordinary meaning of words in a regulation, we are not to assume that an absurd result was intended. *Budding v. SSM Healthcare System,* 19 S.W.3d 678, 681 (Mo.2000).

Lastly, Appellants argue that MDNR's interpretation of this rule is a "post hoc rationalization for the purpose of litigation." This argument is without merit. Appellants point us to nothing in the record to indicate MDNR ever applied this rule other than in accordance with its stated interpretation.

Finding MDNR's interpretation of 10 CSR 10–6.020(2)(B)5 in accordance with the plain and ordinary meaning of the words as used in the context therein, we defer to that interpretation. Point H is denied.

### 4) *Decision*

The Decision and Order of the Commission upholding the issuance of the Permit is affirmed in all respects.

BATES, P.J./C.J., and BARNEY, J., concur.